Filed 7/21/26  In re M.A. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

| | |
|---|---|
| In re M.A., a Person Coming Under the Juvenile Court Law. | C101392 |
| THE PEOPLE,<br>        Plaintiff and Respondent,<br><br>        v.<br><br>M.A.,<br>        Defendant and Appellant. | (Super. Ct. No. JD20230048) |

In April 2023, 13-year-old M.A. took his family's car without permission and drove through downtown Woodland, California.  While a police officer pursued him with his car's sirens and red lights on, M.A. exceeded the speed limit, drove into oncoming traffic, and ran stop signs.  The pursuit ended when M.A. ran a red light and crashed into two vehicles.  Two people died.  In May 2024, the juvenile court sustained a wardship petition under Welfare and Institutions Code section 602 after finding M.A. committed two counts of gross vehicular manslaughter (Pen. Code, § 192, subd. (c)(1)),[1] five counts of willful evasion of a pursuing peace officer and proximately causing serious bodily injury or death (Vehicle Code, § 2800.3, subds. (a), (b)), one count of willful evasion of a

_____

[1] Undesignated statutory references are to the Penal Code.

1

pursuing peace officer with wanton disregard for the safety of persons or property (Veh. Code, § 2800.2, subd. (a)), one count of willful evasion of a pursuing peace officer while driving in the opposite direction of traffic (Veh. Code, § 2800.4), felony child abuse (§ 273a, subd. (a)), unlawful taking or driving a vehicle (Veh. Code, § 10851, subd. (a)), and driving without a license (Veh. Code, § 12500).

M.A. raises numerous claims on appeal, including that there was insufficient evidence he understood the wrongfulness of his acts (§ 26); that there was insufficient evidence he committed gross vehicular manslaughter; and that all but one of the "evasion" counts must be reversed because he engaged in a single continuous act of driving and evading a pursuing peace officer is not a crime of violence. We reject most of M.A.'s claims, but we agree that four of the five Vehicle Code section 2800.3 counts must be stricken.

Accordingly, we will affirm the wardship adjudication but remand the matter for a new disposition order.

BACKGROUND

The People's 2023 juvenile wardship petition alleged that M.A. committed murder and the above-referenced offenses in an April 2023 incident. The following facts, which we recite in the light most favorable to the judgment (see *In re Adrian R.* (2000) 85 Cal.App.4th 448, 452), came out at the contested jurisdiction hearing.

M.A. was 13 years and three months old on the afternoon of April 8, 2023, when his sister drove him to downtown Woodland in their family's Honda Pilot SUV. After they parked and entered a local business, M.A. told his sister he had left his phone in the vehicle. She gave him the keys to retrieve it but did not give him permission to drive.

A bit later that afternoon, a woman who had just finished shopping at Costco in Woodland had to swerve her car out of the way of an SUV that was moving directly toward her at a speed that was "way above 40" miles per hour, despite a speed limit of 25

2

miles per hour on the street. She saw nothing that might have explained why the SUV was moving toward her in her lane and later told police the driver was a younger male.

Around 4:30 p.m. that afternoon, a police sergeant was in downtown Woodland in his black-and-white marked police vehicle. It was a clear and dry day with moderate traffic on the streets and pedestrians on the sidewalks. When the sergeant saw a Honda Pilot drive through a red light at 40 miles per hour on a street with a 25-mile-per-hour speed limit, he decided to conduct a traffic stop. He activated his overhead emergency lights, displaying a steady red light to the front, and followed the Pilot onto Main Street. M.A. did not stop. He continued driving and turned off Main Street without attempting to stop at an intersection with flashing red lights. The sergeant then activated his sirens and continued the pursuit.

M.A. did not stop. He drove through a stop sign at an intersection and entered the opposing lane of traffic to pass a car. Although the sergeant was traveling 55 miles per hour, the Pilot was going faster. About 44 seconds after the sergeant began his pursuit, M.A. drove the Pilot through a red light and collided with two cars at the intersection of College Street and Court Street. Tina Vital and four-year-old Adalina Perez died from injuries sustained in the crash. At least three other people in the two cars were injured but survived.

In the chaotic moments that followed, M.A. told police he had been in the front passenger seat of the Pilot, which he claimed no one was driving at the time of the collision because his sister had parked it on the side of the road. Later, in the hospital, M.A. told his father that the police car behind him had not activated its lights and that he had a green light at the intersection where the crash occurred.

Before the day of the collision, M.A. enjoyed playing video games that involved driving. Once, when M.A.'s father was watching him play a driving video game, he told him that if there were a "situation of police … behind you or after you or want[] to stop you, then you should stop." M.A. replied: " 'Oh, Father, this is just a game.' " He made

3

similar comments to his mother whenever they spoke about driving in real life in contrast to driving video games: "Mom, this is not real life. It's only a game." Although M.A. never asked for permission—and his father never gave him permission—to drive any of the family's vehicles, the People introduced evidence of social media activity by M.A.—(a) videos that he apparently recorded of himself driving his family's cars and (b) his typed comments he posted on videos depicting unsafe driving (recorded and posted by unknown individual(s))[2]—indicating he had driven his family's vehicles in the months leading up to the April 2023 incident.

*M.A.'s January 2023 Conversation with a Police Officer About Driving*

M.A.'s sister was so concerned about his driving that a few months before the incident at issue here she asked a police officer she knew to speak to him and scare him out of driving. The officer went to M.A.'s house in his uniform and his body camera recorded the January 2023 interaction. He explained to M.A. that someone told the police they saw a young person driving a car recently. "Were you by chance driving when you weren't supposed to?" the officer asked. M.A. replied, "No." The officer pressed: "Never driven the car? Just be honest with me. You're not in any trouble." M.A. admitted that he drove a car "once," a few weeks earlier. The officer asked, "Why did you do that? … You do understand the severity of it?" M.A. nodded his head, indicating he understood. The officer explained some of the bad scenarios that could unfold if M.A. drove: (a) he could get "pulled over and they tow [his] parents' car"; (b) he could crash and "whoever gets hurt" might sue him and his parents; (c) child protective services might find out that his parents "had something to do with it," and M.A. could be removed from his home.

---

[2] It is unclear whether M.A. was merely commenting on videos made by others or was commenting on videos that he made.

Later in that conversation, the officer told M.A. to "just wait a couple years because … if you get pulled over now it can make it harder for you to get your license down the road…. And then you don't want to hurt somebody else because you don't know how to drive. It's a very serious thing." M.A. told the officer, "I won't do it again." The officer then told M.A, "I don't want to end up seeing you driving or see a video of you driving again." He asked, "Do I need to talk to your parents?" M.A. replied, "No." The officer confirmed, "You don't want me to talk to them. Okay. Next time I will, okay. So don't do it again."

The officer never told M.A.'s parents about this January 2023 interaction, in part because M.A.'s sister seemed mature, concerned about her brother's well-being, and capable of sharing her concerns with her parents. But the sister never told her parents about M.A.'s driving because she was worried it would exacerbate their health problems. Accordingly, until the April 2023 crash, M.A.'s parents were unaware that he had been driving the family's cars.

*M.A.'s Expert Witness*

A neuropsychologist who testified as an expert on adolescent brains in general (not M.A. specifically) explained that the adolescent prefrontal cortex is not developed enough to regulate emotions well. The neuropsychologist explained that "adolescents experience emotions so incredibly and in a very incredibly strong manner." This means that, especially in "hot … emotionally latent" situations, adolescents' emotions will often override their logical thinking. So while adolescents "may know cars are very dangerous" and that they can get into accidents, "the excessive emotions" they feel from driving "being really fun and exciting, that, unfortunately in the adolescent brain, is going to override the logical knowledge" that driving is dangerous. It is not that an adolescent has *no* ability to curtail dangerous behavior. They have a *reduced* ability to do so.

The neuropsychologist also explained that even when 13-year-olds know that they are creating dangerous situations for others, they may disregard that knowledge due to a

heightened focus on themselves. And adolescents' ability to appreciate the wrongfulness of their behavior, especially in a "hot situation," can "vary wildly" depending on the individual.

*Closing Arguments*

In closing argument to the juvenile court, the People emphasized that M.A. was "[u]nlike the average juvenile" when he drove through downtown Woodland on April 8, 2023, because he had "extensive experience driving, including speeding and driving recklessly." That experience, combined with the January 2023 conversation at his home when the police officer told him about "the dangers of his actions" and the "near miss" shortly before he evaded officers when he almost collided head-on into another car, made it clear that M.A. knew how dangerous his driving was and did not care.

Specifically addressing section 26, the People argued there was clear and convincing evidence that M.A. knew his actions were wrong because, among other things, (a) M.A.'s surreptitious driving without his parents' knowledge showed he knew what he was doing was wrong and he was trying to conceal his actions; (b) a police officer told him in January 2023 that his driving was wrong; and (c) M.A.'s many lies— (1) to the police officer in January 2023 (first that he had not been driving, then that he drove only once, and finally that he would not do it again), (2) to the sergeant just after the crash (when he insisted that he was in the front passenger seat of the parked Pilot when the crash occurred), and (3) to his father in the hospital after the crash (that the police car behind him did not have its lights on and that he had a green light when he crashed into the other cars)—showed he knew what he was doing was wrong.

The People then argued the merits of the evidence that M.A. committed the offenses alleged in the wardship petition.

After arguing the People did not meet their burden to prove that M.A. understood the wrongfulness of his actions, M.A.'s counsel told the juvenile court that while she

6

would center the rest of her argument on the murder allegations, she was not admitting the truth of the other allegations in the wardship petition.

*The Juvenile Court Finds "True" 12 of 14 Allegations in the Wardship Petition*

The juvenile court did not find true the murder allegations (counts 1 & 3) in the wardship petition, but it did find true the other 12 allegations and their related enhancements:  gross vehicular manslaughter (§ 192, subd. (c)(1)—counts 2 & 4); willful evasion of a law enforcement officer causing death to Tina Vital (Veh. Code, § 2800.3, subd. (b)—count 5), with three enhancements for personally inflicting great bodily injury (GBI) upon three others during the commission of the offense (§ 12022.7, subd. (a)) and one enhancement for inflicting GBI upon a child younger than five during the commission of the offense (§ 12022.7, subd. (d)); willful evasion of a law enforcement officer causing death to Adelina Perez (Veh. Code, § 2800.3, subd. (b)—count 6), with four GBI enhancements regarding the four other victims; three counts of willful evasion causing serious bodily injury to the three people who survived their injuries from the crash (Veh. Code, § 2800.3, subd. (a)—counts 7-9), each with four GBI enhancements for the other four victims; willful evasion with wanton disregard for the safety of persons or property (Veh. Code, § 2800.2, subd. (a)—count 10), with five GBI enhancements for the five victims; willful evasion while driving in the opposite direction of traffic (Veh. Code, § 2800.4—count 11); felony child abuse (§ 273a, subd. (a)—count 12) with a GBI enhancement; unlawful taking or driving a vehicle (Veh. Code, § 10851, subd. (a)—count 13) with five GBI enhancements; and driving without a license (Veh. Code, § 12500—count 14).

The juvenile court explicitly found that M.A. knew the wrongfulness of unlawfully taking or driving the Pilot (count 13) and driving the Pilot with gross negligence during the commission of an unlawful act not amounting to a felony (counts 2 & 4).

7

*Disposition*

In a May 2024 report filed with the juvenile court, a probation officer recommended the juvenile court adjudge M.A. to be a ward of the court and commit him to a Yolo County juvenile detention facility for two years (during which he would pursue a detailed treatment plan) with no credit for time he had already spent in custody,[3] followed by GPS monitoring for 90 days to assist him in transitioning back into the community. M.A.'s disposition brief argued the probation officer's plan would likely be more successful if M.A. were given home detention. Counsel argued in the alternative that if the juvenile court were to commit M.A. to a facility, it should award credit for time that M.A. had already spent in custody. The People's disposition brief urged the juvenile court to order M.A. detained until his 21st birthday in January 2031.

In late May 2024, after hearing argument and confirming that it read and considered the parties' disposition briefs, the juvenile court adjudged M.A. a ward of the court and determined (1) his maximum term of confinement for his offenses was 23 years eight months and (2) the appropriate disposition was his detention until his 19th birthday, followed by GPS monitoring of no more than 90 days. The juvenile court explained that its interpretation of the video evidence depicting M.A.'s driving just before the collision was that M.A. was someone who had been driving for "quite a while." And that observation was important to the juvenile court because it illuminated "what kind of supervision might have been taking place" at M.A.'s home. It was "not the supervision that you would expect to see." In other words, "there was a failure to keep an eye on" M.A. The juvenile court also articulated its concerns about M.A.'s disruptive and disobedient conduct in detention: "Is this the behavior of somebody that we need not be concerned about?" "I am concerned," the juvenile court said.

---

[3] According to the report, M.A. had been in custody for 410 days.

After the parties and the juvenile court discussed restitution to the victims and other aspects of the disposition that are not material to this appeal, the juvenile court asked if there was anything else the parties wanted to raise. When no one indicated that there was, the juvenile court ended the hearing.

M.A. filed a timely appeal, and briefing concluded on March 9, 2026, when M.A. filed his reply brief. Oral argument was heard on June 16, 2026.

DISCUSSION

I

*M.A.'s Constitutional Claims Regarding the Disposition are Forfeited on Appeal*

M.A. makes two constitutional challenges to the disposition: (1) the length of the commitment violates his rights to due process, equal protection, and proportionate punishment, because it exceeded the length of time that the juvenile court would have been able to impose if he were an older juvenile; and (2) the length of the commitment violates his constitutional rights because it is greater than "baseline confinement terms for more serious offenses" committed by older offenders who are "by definition more culpable than 13-year-olds."

The People argue these claims are forfeited on appeal because M.A. did not raise them in the juvenile court. In his opening brief, M.A. anticipated the People might argue forfeiture. He argues we nevertheless can address his constitutional claims because (1) they present issues of "pure constitutional law … with no disputable factual component," (2) trial counsel provided ineffective assistance by failing to raise them, (3) the disposition is "unauthorized," and (4) the juvenile court rejected the probation officer's recommended disposition. We agree with the People that the constitutional claims are forfeited and we decline to exercise any discretion we have to consider them.[4]

---

[4] M.A. also contends the juvenile court abused its discretion by imposing a term of commitment that was longer than what the probation officer recommended. The People

9

A.    *Legal Background*

Dispositional orders in juvenile matters are entrusted to the discretion of the juvenile court.  (*In re Greg F.* (2012) 55 Cal.4th 393, 411.)  Failure to object to a discretionary dispositional choice forfeits the claim on appeal.  (*In re G.C.* (2020) 8 Cal.5th 1119, 1130-1131; see *People v. Scott* (1994) 9 Cal.4th 331, 351; *In re Sheena K.* (2007) 40 Cal.4th 875, 885.)  But the forfeiture rule does not apply if the disposition is unauthorized; that is, if it " 'could not lawfully be imposed under any circumstance in the particular case.' "  (*In re G.C.*, at p. 1130.)  In those situations, the unauthorized disposition presents a pure question of law.  (*People v. Fisher* (2021) 71 Cal.App.5th 745, 751-752.)  The " 'unauthorized sentence' " concept is a *narrow* exception to the general requirement that only preserved claims are reviewable on appeal.  (*Scott*, at p. 354.)  And while reviewing courts have the discretion to consider forfeited claims on appeal, they should do so rarely (*In re H.D.* (2024) 99 Cal.App.5th 814, 817-818), keeping in mind that the forfeiture rule exists to encourage prompt detection and correction of error and to promote the state's interest in finality of judgments.  (*In re G.C.*, at p. 1130; *Scott*, at p. 351.)

B.    *Analysis*

Here, M.A. does not contend the juvenile court exceeded its statutory authority in choosing either the length or location of his commitment.  (Cf. *In re Greg F*., *supra*, 55 Cal.4th at p. 404 ["Once jurisdiction on a 602 petition is established, the case proceeds to a dispositional hearing," at which the juvenile court "determine[s] an appropriate disposition" that may include placement in the family home, the home of a relative, a foster home, or juvenile hall].)  Instead, the undeveloped assertion appears to be that the

---

contend this claim is also forfeited on appeal.  Because we are remanding for a new disposition order in light of other errors, we need not address whether the disposition was the result of an abuse of discretion.

10

dispositional order is "unauthorized" because it is unconstitutional.[5]  On its face, the assertion is unpersuasive because it would eradicate the forfeiture rule as to every appellate constitutional challenge to a dispositional order or sentence that is raised for the first time on appeal.  (Cf. *People v. Anderson* (2020) 9 Cal.5th 946, 962 [the unauthorized sentence exception "is designed to provide relief from forfeiture for 'obvious legal errors at sentencing' " such as "a sentence in excess of the statutory maximum"].)

Further, we disagree with M.A.'s contention that his constitutional challenges to the disposition present pure legal questions.  His challenges ask us to consider his "self-evident" lesser culpability relative to an older juvenile.  But culpability determinations are for the trier of fact, not an appellate court.[6]  (Cf. *People v. Vang* (2010) 184 Cal.App.4th 912, 915-916 ["section 654 serves to match a defendant's culpability with punishment," and whether "the provision 'applies in a given case is a question of fact for the trial court' "].)  And the record reflects the juvenile court considered M.A.'s unique circumstances when it crafted the disposition; it did not treat him simply as a generic 13-year-old juvenile.[7]

---

[5]  And the dispositional order is unconstitutional, M.A. seems to assert, because the juvenile court would not have been able to order a similar disposition if M.A. were "much older."

[6]  For the proposition that 13-year-olds are less culpable than older juveniles "by definition," M.A. cites *In re Gladys R.* (1970) 1 Cal.3d 855, 863-864.  But the cited portion of the case does not stand for that proposition.  It merely discusses section 26's rebuttable presumption that minors under the age of 14 are incapable of committing a crime.  Accordingly, M.A. provides us with no on-point authority for the proposition that a 13-year-old who commits an offense is categorically less culpable than an older juvenile who commits the same offense.

[7]  The dual purpose of juvenile justice laws is to serve a juvenile ward's best interests through rehabilitation and to protect the public.  (*In re Charles G.* (2004) 115 Cal.App.4th 608, 613-615.)  California law requires that wards of the juvenile court "receive care, treatment, and guidance that is consistent with their best interest, that holds

M.A.'s contention that his unpreserved constitutional claims are reviewable "because trial counsel sought and the juvenile court rejected a disposition of the Probation Officer's treatment plan" is puzzling and lacks citation to any authority. To the contrary, and as explained above, failure to object to a discretionary dispositional choice forfeits the claim on appeal.

Finally, M.A. contends we should consider his forfeited claims because his trial counsel provided ineffective assistance by failing to raise them. (See *People v. Torres* (2025) 113 Cal.App.5th 88, 92 [to forestall a claim of ineffective assistance of counsel, reviewing courts can exercise their discretion to reach the merits of the claim].) But trial counsel is not ineffective for failing to raise novel claims like the ones here. (See *In re Grinder* (2025) 114 Cal.App.5th 845, 871-872; *People v. Foster* (2003) 111 Cal.App.4th 379, 385.)

We decline to exercise any discretion we might have to consider these forfeited claims because doing so (1) would be unfair to the People and the juvenile court, which had no opportunity to address the claims below (*In re M.H.* (2016) 1 Cal.App.5th 699, 713-714), and (2) would undermine both the state's interest in finality of judgments and litigants' incentive to seek correction of error in the first instance (*In re G.C.*, *supra*, 8 Cal.5th at p. 1130-1131; *People v. Scott*, *supra*, 9 Cal.4th at p. 351). Further, we should not " 'reach constitutional questions unless absolutely required to do so to dispose of the matter before us.' " (*Facebook, Inc. v. Superior Court (Hunter)* (2018) 4 Cal.5th 1245, 1275, fn. 31.)

Accordingly, M.A.'s constitutional challenges to the dispositional order are forfeited on appeal, and we will not consider them.

---

them accountable for their behavior, and that is appropriate for their circumstances," including punishment consistent with rehabilitative objectives. (§ 202, subd. (b).)

## II

### *Section 26*

M.A. contends there was insufficient evidence for the determination under section 26 that he knew the wrongfulness of all his acts. Specifically, while conceding there was sufficient evidence he knew his driving was wrong for purposes of section 192, subdivision (c)(2), he argues there was insufficient evidence to establish his capacity to commit vehicular manslaughter *with gross negligence* under subdivision (c)(1) of the statute. He reasons that section 26, and California case law interpreting it, demand a determination that he had the capacity to *evaluate the consequences* of his acts. We agree with the People that the authority M.A. relies on does not stand for the proposition he asserts. Further, we reject M.A.'s attempt to transmute current social science theories into section 26's threshold determination of capacity.

There was sufficient evidence for the juvenile court's implicit determination that M.A. understood the wrongfulness of his acts.

### A. *Legal Background*

Section 26 provides, in relevant part: "All persons are capable of committing crimes except those belonging to the following classes: [¶] One—Children under the age of 14, in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness."

Accordingly, under the statute, "a minor under the age of 14 is presumed to be incapable of committing a crime," and "a finding of capacity is a prerequisite to an adjudication of wardship for a minor under 14. [Citations.] The presumption of incapacity may be rebutted by the production of ' "clear proof" ' that the minor appreciated the wrongfulness of the conduct when it was committed. [Citation.] ' "[C]lear proof" ' means clear and convincing evidence." (*In re Joseph H.* (2015) 237 Cal.App.4th 517, 538.) "The test on appeal is whether substantial evidence supports the conclusion of the trier of fact. [Citations.] We review the entire record in the light

13

most favorable to the judgment and affirm the [juvenile] court's findings that the minor understood the wrongfulness of his conduct if they are supported by substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*Ibid.*) "In determining capacity … the juvenile court must consider the child's age, experience, and understanding. [Citations.] A minor's knowledge of his act's wrongfulness may be inferred from the circumstances, such as the method of its commission or its concealment." (*Id*. at p. 539.)

B. *Analysis*

1. *The Test*

While the language of the statute refers to knowledge of wrongfulness, our Supreme Court in *In re Manuel L.* (1994) 7 Cal.4th 229 explained the question is whether a minor "*appreciate*[*s*] the wrongfulness of their conduct." (*Id.* at p. 232, italics added.) M.A. argues the test under section 26 is even more granular here because of the "multilayered" nature of his offenses: he contends he must have had the capacity to evaluate/rationally assess the consequences of his acts. We disagree.

Invoking social science literature and the testimony of his expert witness below, M.A. invites us to alter the legal test under section 26 by narrowing the question that trial courts and juvenile courts must answer from capacity to "appreciate the wrongfulness" of conduct to the more exacting standard of capacity to "evaluate the consequences" of conduct. We decline the invitation. (Cf. *United States v. Rahimi* (2024) 602 U.S. 680, 739 (conc. opn. of Barrett, J.) [highlighting the "difficulty" posed by a "level of generality problem"]; *Arar v. Ashcroft* (2d Cir. 2009) 585 F.3d 559, 572 (en banc) ["At a sufficiently high level of generality, any claim can be analogized to some other claim … just as at a sufficiently high level of particularity, every case has points of distinction"].)

The two California appellate court decisions that M.A. invokes in support of his proposed formulation do not persuade us. In *People v. Nichols* (1948) 88 Cal.App.2d

14

221, the appellate court modified a judgment from first degree murder to second degree murder after determining that the 13-year-old minor (with a mental age of 11) did not plan or intend in advance to kill. (*Id.* at pp. 222-223, 228-229.) In reaching this result, the court observed that the principle encapsulated in section 26 is "*a part of the general circumstances* which must be considered with other facts in determining whether the evidence is sufficient to show beyond a reasonable doubt that this killing was deliberate and premeditated." (*Id.* at pp. 228-229, italics added.) The case simply does not support the proposition that section 26 requires the finding that a minor had the capacity to evaluate and rationally assess the consequences of their acts.

The other case M.A. relies on, *In re Michael B.* (1983) 149 Cal.App.3d 1073, is also not persuasive. There, the appellate court articulated three reasons why it reversed the juvenile court's judgment that a nine-year-old committed involuntary manslaughter: (1) the minor's rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 were violated, (2) the admissible evidence against the minor did not constitute clear proof that he understood the wrongfulness of the act charged against him, and (3) the evidence also did not meet the constitutional standard of proof beyond a reasonable doubt. (*In re Michael B.*, at p. 1077.)[8]

When clearly discussing section 26, the appellate court hewed to some version of the traditional articulation of the test: a minor must understand or appreciate the wrongfulness of the act charged.[9] But in one paragraph that does not mention section 26,

---

[8] One jurist agreed with the *Miranda* analysis but dissented from the remainder of the majority's analysis. (*In re Michael B.*, *supra*, 149 Cal.App.3d at p. 1090 (conc. & dis. opn. of Caeton, J.).)

[9] By our count, there were at least five instances when the appellate court articulated the test in this way. (See *In re Michael B.*, *supra*, 149 Cal.App.3d at p. 1077 ["The other evidence against appellant does not constitute 'clear proof' that at the time of the shooting appellant *understood the wrongfulness of the act* charged against him, *as*

the appellate court said the following: "It is axiomatic that before a child may act without a proper regard for human life in the context of an unlawful homicide, he must *fully appreciate the consequences of taking a life*. He must appreciate the permanence of death. This requires more than knowledge gained through playing games or watching television that people who are shot with guns fall down and are 'dead.' [The expert] testified that [the minor] as a normal nine year old did not understand the permanence of death; he did not *appreciate the consequences* of threatening the victim with the gun. Although the trial court was free to reject the [expert's] opinions, the prosecution introduced no expert testimony to the contrary, and we find no solid, credible evidence in the record to support a finding that [the minor] understood the possibly fatal consequences of his actions." (*In re Michael B*., *supra*, 149 Cal.App.3d at p. 1088, italics added, original italics omitted.) It is this passage (specifically the phrase "appreciate the consequences") that M.A. invokes for support of his argument that under section 26, the juvenile court in his case had to determine that he could *evaluate/rationally assess the consequences* of his acts.

Cases are not authority for propositions not considered. (*B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 11.) In the context of the entire opinion, it is apparent the court in *In re Michael B.* did not intend to hold broadly that, under section 26, a juvenile

required by Penal Code section 26" (italics added)]; *id*. at p. 1086 ["We turn now to the questions whether … the other evidence in the record … show[s] that appellant *knew the wrongfulness of the act* charged against him *as mandated by Penal Code section 26*" (italics added)]; *ibid*. ["*Penal Code section 26* … is based on the common law rule that children under 14 are presumed incapable of criminal acts unless the child possesses the requisite age and experience to *understand the* wrongfulness of his or her act" (italics added)]; *id*. at pp. 1087-1088 [rejecting the Attorney General's argument that there was "clear and convincing proof that appellant *appreciated the wrongfulness of his conduct as required by Penal Code section 26*" (italics added)]; *id.* at p. 1088 ["Nor can appellant's *appreciation of the wrongfulness of the act* charged against him be inferred from the bare commission of the act itself. This would frustrate the purpose of *Penal Code section 26*." (italics added)].)

court must find a minor appreciated the *consequences* of his acts, as opposed to the *wrongfulness* of those acts. The paragraph in the opinion containing language suggestive of that proposition does not mention section 26. Given the established standard for measuring capacity set out in section 26, the language in *In re Michael B.* on which M.A. relies cannot bear the weight he ascribes to it.

Our disagreement with M.A.'s proposed test under section 26 is not a comment on his policy arguments, as questions of policy are for the Legislature. (See *People v. Braden* (2023) 14 Cal.5th 791, 819 [while the Legislature is free to make policy choices and amend statutes, courts must faithfully interpret clear statutory language].) It is not for us to engraft modern social science concepts onto the legal question of whether a minor appreciates the wrongfulness of their conduct.

C.    *Substantial Evidence*

The question is whether substantial evidence supports the finding that M.A. appreciated the wrongfulness of his conduct. (*In re Manuel L.*, *supra*, 7 Cal.4th at p. 232.) We agree with the People the answer is yes. (See *In re K.M.* (2024) 102 Cal.App.5th 910, 914 ["An implied finding of capacity under section 26 is reviewed for substantial evidence"].)

M.A. was 13 years and three months old in April 2023. As minors approach the age of 14, they are increasingly likely to appreciate the wrongfulness of their acts. (*People v. Cottone* (2013) 57 Cal.4th 269, 281; *In re J.E.* (2020) 54 Cal.App.5th 309, 314.)

M.A.'s father testified that when he saw M.A. playing a driving video game, he told him that if police were behind him and wanted to stop him, he should stop. M.A. indicated he understood when he replied: " 'Oh, Father, this is just a game.' " M.A.'s mother testified that he made similar comments indicating he understood that driving in real life is different than driving in a video game: "Mom, this is not real life. It's only a

game." These comments support the inference that M.A. understood that vehicular evasion of police is wrong.

Moreover, M.A.'s surreptitious driving without his parents' knowledge suggested he sought to avoid detection of something he knew was wrong. (*In re Joseph H.*, *supra*, 237 Cal.App.4th at p. 539 ["A minor's knowledge of his act's wrongfulness may be inferred from the circumstances, such as the method of its commission or its concealment"].)

The remarkable January 2023 conversation with a police officer at his home supports the determination that M.A. knew it was wrong to drive, in part because he could *hurt people*. In addition to extracting a promise from M.A. that he would not drive again, the uniformed police officer told M.A. twice that he could hurt someone if he drove again and warned him it was "a very serious thing."

Further, evidence of consciousness of guilt can support a determination of knowledge of wrongfulness under section 26. (See *People v. Lewis* (2001) 26 Cal.4th 334, 379 ["Defendant's flight from the scene and his conflicting statements to detectives constitute clear proof that defendant knew the wrongfulness of his act"]; *In re James B.* (2003) 109 Cal.App.4th 862, 873 ["Having initially lied and hidden the evidence, and then leading the deputy to it, all indicate that minor was aware of the wrongfulness of his actions"]; *In re Paul C.* (1990) 221 Cal.App.3d 43, 53 [the minor's knowledge of wrongfulness could be inferred from the choice of a secluded location for the offense, which indicated his desire to minimize the risk of detection and punishment, and from the minor's initial denial that he committed the act when questioned].) Here, M.A.'s dishonesty to police and his father after the crash suggests a consciousness of guilt, indicating he understood that his driving and evasion were wrong.

We also agree with the People that the circumstantial evidence that M.A. was the other driver involved in the near collision with the Costco shopper on the afternoon of the fatal crash supports the determination that M.A. knew his driving was dangerous.

18

M.A.'s expert's undisputed testimony that—as a general matter—minors' emotions will often override their logical thinking in "hot" situations, thereby reducing their ability to curtail dangerous behavior, does not undermine the sufficiency of the evidence that M.A. appreciated the wrongfulness of evading police by speeding through downtown Woodland, driving in the opposite lane of traffic, and ignoring stop signs and red lights. To the contrary, "even if" M.A. "acted out of instinct and fear," it does not necessarily follow that he "did not understand h[is] conduct was wrong." (*In re J.E.*, *supra*, 54 Cal.App.5th at p. 316 [concluding there was substantial evidence to support the trial court's finding that the minor knew her acts were wrong].)

M.A.'s ostensibly discrete contention that the juvenile court used an "inadequate legal standard for capacity" is unpersuasive. He argues the juvenile court viewed the issue of capacity as "nothing more than that [M.A] knew it was wrong to drive," as evidenced by its failure to mention in its oral findings the notion that M.A. had the capacity to evaluate the consequences of evading police. Because we have already rejected M.A.'s construction of section 26 as requiring a determination of his capacity to evaluate the consequences of his acts, we similarly reject this contention.

Accordingly, substantial evidence supports the juvenile court's implied finding that M.A. appreciated the wrongfulness of his conduct.[10]

---

[10]  We also reject M.A.'s contention that there must be a separate section 26 analysis for the GBI enhancements associated with his offense of unlawfully taking or driving a vehicle. (Veh. Code, § 10851, subd. (a).)  He cites no authority for that proposition, and section 26 is concerned with "*the act* charged," not shades and variations of the act or its results. (Cf. *People v. Escarcega* (2019) 32 Cal.App.5th 362, 376 [" 'Provisions describing substantive crimes … generally define criminal *acts*,' " whereas "[s]entence enhancements and alternate penalty provisions," " 'increase the punishment for those acts,' " by " 'focus[ing] on *aspects* of the criminal act that are not always present and that warrant additional punishment' "].)

# III

## *Sufficiency of Evidence for Gross Vehicular Manslaughter*

M.A. argues there was no evidence he acted with the gross negligence necessary for counts 2 and 4.  Specifically, and like his arguments above regarding section 26, he asserts that because he could not "*meaningfully evaluate* the consequences" of what he was doing, there is no evidence to support the juvenile court's true findings of gross vehicular manslaughter.  (Italics added.)  He cites no authority for support of the "meaningfully evaluate" standard, and we are not persuaded.

"Gross negligence is the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences.  [Citation.]  'The state of mind of a person who acts with conscious indifferences to the consequences is simply, "I don't care what happens." ' [Citation.]  The test is objective:  whether a reasonable person in the defendant's position would have been aware of the risk involved."  (*People v. Bennett* (1991) 54 Cal.3d 1032, 1036.)

"I don't care what happens" is quite distinct from "I have meaningfully evaluated the consequences of what might happen, and I don't care."  The former is the actual legal test; the latter is the test M.A. invites us to apply.  We decline the invitation.

There is substantial evidence for the finding that M.A. acted with gross negligence on the afternoon of April 8, 2023.  About three months before the crash, a police officer warned M.A. that he could hurt other people if he drove.  There is evidence that about six weeks before the crash, M.A. posted the statement "I didn't even crash" in connection with a driving video on social media, indicating an awareness of the risk that he might crash a car if he drove.  And there is evidence that before he tried to evade police, he nearly crashed into the Costco shopper, a frightening event that a reasonable person would take to heart if they continued to drive that day.

IV

*M.A. Did Not Challenge a Relevant Standard in the Juvenile Court*

Invoking out-of-state case law for support, M.A. argues that instead of the reasonable person standard articulated in *People v. Bennett*, *supra*, 54 Cal.3d 1032, we should apply a " 'reasonable minor of similar age and characteristics' " standard to the gross negligence inquiry. He has not demonstrated that he raised this argument in the juvenile court. Accordingly, we agree with the People that the issue is forfeited on appeal. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 430 ["The trial court, contrary to defendants' arguments, did not apply an incorrect standard in resolving this issue, nor did defendants raise the assertion below, forfeiting this challenge"].)

V

*The Vehicular Evasion Counts (Counts 5-11)*

Invoking *Wilkoff v. Superior Court* (1985) 38 Cal.3d 345 (*Wilkoff*) and *People v. Garcia* (2003) 107 Cal.App.4th 1159 (*Garcia*), M.A. contends the juvenile court's "true" findings on six of the seven "counts for evasion" under Vehicle Code sections 2800.2, 2800.3, and 2800.4 are unauthorized because he engaged in a single continuous act of driving. We agree that four of the five Vehicle Code section 2800.3 true findings must be stricken. The true findings for violating Vehicle Code sections 2800.2 (count 10) and 2800.4 (count 11), however, may stand.

A.    *Legal Background*

In *Wilkoff*, "our Supreme Court held that 'a charge of multiple counts of violating a statute is appropriate only where the actus reus prohibited by the statute—the gravamen of the offense—has been committed more than once.' [(*Wilkoff*, *supra*, 38 Cal.3d at p. 349.)] There, the defendant was charged with multiple counts of felony driving under the influence ([Veh. Code,] § 23153) arising out of a single incident in which six persons were injured or killed. The court held that only one count could be charged because the actus reus of the offense did not include causing bodily injury. (*Wilkoff*, at p. 352.) 'A

21

defendant may properly be convicted of multiple counts for multiple victims of a single criminal act only where the act prohibited by the statute is centrally an "act of violence against the person." [Citation.]' (*Id.* at p. 351.)" (*Garcia*, *supra*, 107 Cal.App.4th at pp. 1162-1163.)

Our Supreme Court explained that the gravamen of Vehicle Code section 23153 was "defined in terms of an act of driving: the driving of a vehicle while intoxicated and, when so driving, violating any law relating to the driving of a vehicle. The actus reus of the offense does not include causing bodily injury. Rather, where bodily injury *proximately results* from the prohibited act, the offense is elevated from a misdemeanor to a felony. [¶] Defendants are not chargeable with a greater *number* of offenses simply because the injuries proximately caused by their single offense are greater." (*Wilkoff*, *supra*, 38 Cal.3d at p. 352.)[11]

Vehicle Code section 2800.3 provides that "[w]henever willful flight or attempt to elude a pursuing peace officer in violation of Section 2800.1[12] proximately causes"

---

[11] The Legislature can always alter this approach for a given offense, if it wants to. (See *People v. Hairston* (2009) 174 Cal.App.4th 231, 238 ["*Unless the Legislature says otherwise*, if a defendant commits a single criminal act that affects multiple victims, he can be convicted of multiple counts of violating the same statute only if the gravamen of the offense 'is centrally an "act of violence against the person" ' " (italics added)].)

[12] Vehicle Code section 2800.1, subdivision (a) provides: "Any person who, while operating a motor vehicle and with the intent to evade, willfully flees or otherwise attempts to elude a pursuing peace officer's motor vehicle, is guilty of a misdemeanor punishable by imprisonment in a county jail for not more than one year if all of the following conditions exist: [¶] (1) The peace officer's motor vehicle is exhibiting at least one lighted red lamp visible from the front and the person either sees or reasonably should have seen the lamp. [¶] (2) The peace officer's motor vehicle is sounding a siren as may be reasonably necessary. [¶] (3) The peace officer's motor vehicle is distinctively marked. [¶] (4) The peace officer's motor vehicle is operated by a peace officer … and that peace officer is wearing a distinctive uniform."

serious bodily injury (subd. (a)) or death (subd. (b)) "the person driving the pursued vehicle … shall be punished." (Veh. Code, § 2800.3, subds. (a), (b).)

Applying the principles articulated in *Wilkoff*, the appellate court in *Garcia* ruled that "felony evading, as defined by the Legislature," in Vehicle Code section 2800.3, "is not a crime of violence." (*Garcia*, *supra*, 107 Cal.App.4th at p. 1163; cf. *People v. Sanchez* (2001) 86 Cal.App.4th 970, 973-974 ["[B]ecause dispositive elements of [Vehicle Code] section 2800.3 can be satisfied by conduct that does not necessarily pose a high probability of death, it is not a felony inherently dangerous to human life"].)

B.      *Analysis*

The People agree that M.A.'s evading here was a continuous course of conduct and therefore was a "single incident" for purposes of the rule in *Wilkoff*.[13]  And without explicitly saying so, they invite us to disagree with *Garcia*'s holding that a violation of Vehicle Code section 2800.3 is not a crime of violence.  They agree we must determine whether an offense is a crime of violence as defined by statute.  Their reasoning breaks down, however, when they contend that Vehicle Code section 2800.3 *is* a crime of violence because the statute "expressly requires that the defendant, while evading, proximately cause death or [serious bodily injury] to another person."

*Wilkoff* makes clear that the operative question is whether the gravamen of an offense is an act of violence against a person, not whether the gravamen *proximately causes* injury to another person. (See *Wilkoff*, *supra*, 38 Cal.3d at p. 352 ["Defendants are not chargeable with a greater *number* of offenses simply because the injuries proximately caused by their single offense are greater"].) In other words, even if

---

[13] Our Supreme Court explained that "if a driver collides with one car and is involuntarily propelled into a second car, only 'one instance' of driving has occurred. But if a driver collides with the first car and then *voluntarily* drives further and collides with a second car, then two acts of driving have occurred and the driver may be charged with two counts of felony drunk driving." (*Wilkoff*, *supra*, 38 Cal.3d at p. 349, fn. 4.)

violence against or injury to a person is a *consequence* of the gravamen of a crime, it does not necessarily follow that the crime is one of violence. For example, in *People v. Walker* (2014) 231 Cal.App.4th 1270, the court relied on *Wilkoff* in ruling that the third element of the crime of "DUI causing injury" (Veh. Code, § 23153, subd. (a)) is *not* part of the gravamen of the crime (*Walker*, at p. 1275). The court reasoned that—because the crime's elements were (1) driving a vehicle while under the influence of an alcoholic beverage; (2) when so driving, committing some act that violates the law or fails to perform some duty required by law; and (3) *as a proximate result* of such violation of law or failure to perform a duty, another person was injured—the "first two elements define[d] the *conduct* prohibited by this offense, while the third element set[] forth the required *consequence* of that conduct; the third element is accordingly not part of the 'actus reus' of that crime." (*Ibid*.)

Likewise, although an *element* of Vehicle Code section 2800.3 is that evasion of a pursuing peace officer "proximately causes" serious bodily injury or death, the gravamen (or "actus reus") of the offense is evasion. The consequence of that evasion is not part of the gravamen of the offense. Accordingly, the People's argument that the statute is a crime of violence because it "expressly requires" proximately causing death or serious bodily injury to another person is unpersuasive, and we agree with M.A. that under *Wilkoff* and *Garcia* there can be only one Vehicle Code section 2800.3 true finding here.

Thus, four of the five Vehicle Code section 2800.3 true findings must be stricken. The true findings for violating Vehicle Code sections 2800.2 (count 10) and 2800.4 (count 11), however, may stand because they involve violations of different statutes, rendering the *Wilkoff* rule inapplicable. (See *Wilkoff*, *supra*, 38 Cal.3d at p. 349.)[14]

---

[14] In his reply brief, M.A. argues for the first time, and conclusorily, that Vehicle Code sections 2800.2 and 2800.3 are lesser-included offenses of section 2800.4. The contention is forfeited on appeal because it is improper to raise new contentions in a reply

Striking four of the five Vehicle Code section 2800.3 true findings requires remand for a new disposition order.

VI

*The GBI Enhancements for the Vehicle Code Section 2800.3 True Finding*

M.A. argues that all the GBI enhancements (§ 12022.7) to his Vehicle Code section 2800.3 offenses (counts 5-9) must be stricken, because (1) the infliction of "serious bodily injury" is an element of Vehicle Code section 2800.3; (2) the term "serious bodily injury" has substantially the same meaning as the term "great bodily injury" in section 12022.7; and (3) section 12022.7, subdivision (g) says the GBI enhancement "shall not apply … if infliction of great bodily injury is an element of the offense." (§ 12022.7, subd. (g).) We agree.

M.A. argues that because serious bodily injury and great bodily injury are so similar under California case law,[15] section 12022.7, subdivision (g)'s bar on imposing the GBI enhancement when "infliction of great bodily injury is an element of the offense" means a GBI enhancement may not be imposed where serious bodily injury is an element of the underlying offense. The People disagree, invoking the recent decision of *In re Cabrera* (2023) 14 Cal.5th 476 (*Cabrera*).

In *Cabrera*, the defendant was charged with assault by means of force likely to produce GBI and battery with serious bodily injury. The jury found the defendant had inflicted serious bodily injury, but deadlocked on whether he inflicted GBI, resulting in a mistrial on that charge. (*Cabrera*, *supra*, 14 Cal.5th at p. 482.) At sentencing, the trial

---

brief. (*People v. Taylor* (2004) 119 Cal.App.4th 628, 642-643.) The contention is also forfeited because it lacks meaningful analysis and citation to supporting authority. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793.)

[15] See *People v. Burroughs* (1984) 35 Cal.3d 824, 831 [" ' "[serious] bodily injury" and "great bodily injury" are essentially equivalent elements' "]; *People v. Beltran* (2000) 82 Cal.App.4th 693, 696 ["The terms 'serious bodily injury' in section 243 and 'great bodily injury' in section 12022.7 have substantially the same meaning"].)

25

court found the defendant had committed "serious felonies" warranting a five-year enhancement, because the jury's serious bodily injury finding established the crimes involved inflicting GBI. (*Ibid*.) Our Supreme Court reversed because in the specific context of the constitutional right to a jury under *Apprendi v. New Jersey* (2000) 530 U.S. 466, "[n]ear equivalence does not mean that a finding of serious bodily injury necessarily entails" GBI. (*Cabrera*, at p. 492.)

The import of *Cabrera* is that a jury finding of serious bodily injury does not authorize a court to sentence a defendant to increased punishment for great bodily injury based on judicially found facts. In reaching this result, our Supreme Court cautioned that its holding was strictly limited to the specific context of the constitutional issue it faced. (*Cabrera*, *supra*, 14 Cal.5th at pp. 490-492.) It devoted multiple paragraphs of its opinion to emphasize that it was not questioning existing case law "in other contexts" that have relied on its own pronouncements that serious bodily injury and great bodily injury are essentially equivalent. (*Ibid*.) "For example," the court explained, "the Courts of Appeal have long construed Penal Code section 12022.7, subdivision (g)'s bar on imposing the great bodily injury enhancement when 'infliction of great bodily injury is an element of the offense' to mean that the enhancement may not be imposed where serious bodily injury is an element of the underlying offense. (See, e.g., *People v. Beltran*[, *supra*, ]82 Cal.App.4th [at pp. ]696-697.)" (*Cabrera*, at p. 490.)

Given these explicit caveats, we reject the People's invitation to treat *Cabrera* as having impliedly overruled the non-*Apprendi* cases the court made clear it was not disturbing, including *Beltran*. We therefore conclude that the juvenile court's imposition of great bodily injury enhancements on M.A.'s Vehicle Code section 2800.3 offenses was unauthorized.

*Felony Child Abuse*

M.A. argues that because there was no evidence he intended to inflict injury on anyone, count 12 must be reversed.  The People argue M.A. misunderstands the theory for count 12 that they advanced in the juvenile court and that substantial evidence supports the true finding on count 12.  We agree that substantial evidence supports the juvenile court's true finding on count 12 under an "indirect" theory.

A.      *Legal Background*

Section 273a, subdivision (a) proscribes four categories of conduct:  (1) willfully causing or permitting a child to suffer; (2) inflicting unjustifiable physical pain or mental suffering; (3) having care or custody of a child, willfully causing or permitting the child to be injured; or (4) willfully causing or permitting a child to be placed in a situation where his or her health may be endangered.  (*People v. Valdez* (2002) 27 Cal.4th 778, 783 (*Valdez*).)  The second category involves " 'direct infliction,' " the remaining three categories involve " 'indirect infliction.' "  (*In re L.K.* (2011) 199 Cal.App.4th 1438, 1445.)  Direct infliction requires general criminal intent, similar to battery or assault with a deadly weapon.  Indirect infliction requires criminal negligence.  (*Ibid*.)

"Criminal negligence is ' "aggravated, culpable, gross, or reckless … conduct … [that is] such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life…." ' [Citation.]  'Under the criminal negligence standard, knowledge of the risk is determined by an objective test:  "[I]f a reasonable person in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness." ' "  (*Valdez*, *supra*, 27 Cal.4th at p. 783.)  " '[T]here can be no criminal negligence without actual or constructive knowledge of the risk.' "  (*Ibid*.)

The word " ' "willfully" ' " in section 273a, subdivision (a)—concerning indirect infliction—" 'when applied to the intent with which an act is done or omitted, implies

simply a purpose or willingness to commit the act, or make the omission referred to. It does *not* require any intent to violate [the] law, *or to injure another*, or to acquire any advantage.' " (*Valdez*, *supra*, 27 Cal.4th at pp. 787-788, italics added; see *People v. Burton* (2006) 143 Cal.App.4th 447, 455 (*Burton*) ["The term 'willfully' in the section 273a context of indirect conduct implies simply a purpose or willingness to commit the act or make the omission referred to"].)

      B.    *Analysis*

      Contrary to M.A.'s contention, the record reflects the People pursued an "indirect infliction" theory in the juvenile court, and there is substantial evidence for the true finding under that theory. A reasonable person who exceeded the speed limit while driving through red lights and stop signs in downtown Woodland in the afternoon would have been aware of the risk of a serious car crash. M.A's conduct, despite a presumed awareness of this risk, was incompatible with a proper regard for human life. (*Valdez*, *supra*, 27 Cal.4th at p. 783.)

      M.A.'s contention that "[i]ndirect infliction is not an issue" here because "by the time he crawled out of the wreckage, emergency responders were already on scene," is difficult to understand and not supported by meaningful analysis and citation to authority. Accordingly, to the extent his argument is that a theory of indirect infliction of harm is inapplicable here as a matter of law, the argument is forfeited. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 408 [appellant must present meaningful legal analysis supported by citations to authority].) On the merits, the contention is unpersuasive because a theory of indirect infliction in the section 273a context is proper when harm to a child is the *effect* of purposeful conduct that was not intended to harm a child. (Cf. *Burton*, *supra*, 143 Cal.App.4th 447, 454-455 [because "there [was] no suggestion that defendant intended to directly inflict suffering on his older son," the § 273a conviction "rests on whether defendant … willfully caused or permitted the minor to suffer"].)

28

M.A.'s suggestion that there must be evidence that he "had the purpose" to cause Adalina Perez "to suffer physical pain" is not correct.  There must be evidence that he had a purpose to engage in his risky behavior, not that he had " 'any intent … to injure another.' " (*Valdez*, *supra*, 27 Cal.4th at pp. 787-788; *Burton*, *supra*, 143 Cal.App.4th at p. 455.)

In his reply brief, M.A. alludes to a distinct contention for the first time:  that under *Valdez*, an indirect theory is valid *only* when the conduct at issue is " 'intrinsically lawful.' "  We disagree.  While *Valdez* says that "criminal negligence is the appropriate standard when the act is intrinsically lawful, such as leaving an infant with a babysitter" (*Valdez*, *supra*, 27 Cal.4th at p. 789), it does not say that criminal negligence is the appropriate standard *only* when the act is intrinsically lawful.  In fact, *Valdez* indicates that "an act or omission amounting to criminal negligence can constitute a willful violation of the law." (*Id.* at p. 790; see *Burton*, *supra*, 143 Cal.App.4th at p. 455 ["The term 'willfully' in the section 273a context of indirect conduct implies simply a purpose or willingness to commit the act or make the omission referred to; an act or omission amounting to criminal negligence can, in limited contexts, constitute a willful violation of the law"].)

## VIII

### *The Propriety of Multiple GBI Enhancements to Some Counts*

M.A. argues that no more than one GBI enhancement is permitted for any given true finding.  He proposes three independent routes by which we can reach that conclusion.  We reject them all.

First, he contends *People v. Cook* (2015) 60 Cal.4th 922 supports his argument. We disagree.

Relevant here, section 12022.7, subdivision (g) provides:  "This section shall not apply to murder or manslaughter."

In *Cook*, the defendant caused an automobile accident that killed multiple people and injured a fourth person. (*People v. Cook*, *supra*, 60 Cal.4th at p. 924.) The jury found the defendant guilty of three counts of vehicular manslaughter. (*Ibid*.) The jury also found true three allegations that the defendant personally inflicted GBI as to the first manslaughter count. (*Ibid*.) Our Supreme Court ruled that "the sentence for manslaughter may not be enhanced for the infliction of [GBI] as to anyone." (*Ibid*.) This was so, our Supreme Court reasoned, because "[s]ubdivision (g) [of section 12022.7] means what it says—[GBI] enhancements simply do not apply to murder or manslaughter." (*Id*. at p. 935.)

*Cook* is inapposite here, because M.A.'s two manslaughter counts (counts 2 & 4) *have no GBI enhancements*. *Cook* interpreted the language of section 12022.7, subdivision (g), nothing more.

The second route that M.A. proposes is based on an interpretation of subdivision (h) of the statute that is unpersuasive. Subdivision (h) of section 12022.7 provides: "The court shall impose the additional terms of imprisonment under subdivision (a), (b), (c), or (d), but may not impose more than one of those terms for the same offense." He argues the plain language of the subdivision only permits one enhancement per *offender*, not one enhancement per victim.

M.A. disagrees with *People v. Ausbie* (2004) 123 Cal.App.4th 855, disapproved on another ground in *People v. Santana* (2013) 56 Cal.4th 999, 1011, fn. 6, which addressed and rejected a version of the argument that he presents to us: "Contrary to appellant's argument, the statutory language does not limit the number of section 12022.7, subdivision (a) enhancements to be imposed when there are multiple victims. Properly construed, subdivision (h) simply prohibits the trial court from imposing more than one section 12022.7 enhancement for injury to an individual victim." (*Ausbie*, at p. 864.) "We … construe section 12022.7, subdivision (h) as limiting the sentencing court to one of the subdivision (a), (b), (c), or (d) enhancements for each injured victim, but not

30

as prohibiting the court from imposing a section 12022.7 enhancement for each victim of a single offense when there are multiple victims who suffered great bodily injury." (*Ibid*.)  We agree with *Ausbie*.

The third route that M.A. proposes relies on a flawed understanding of *People v. Ahmed* (2011) 53 Cal.4th 156.  M.A. appears to contend that our Supreme Court's reasoning in *Ahmed* supports his position that no more than one GBI enhancement is permitted for any given true finding in his case.  Far from it.  Interpreting a statute that is not at issue here, our Supreme Court explained:  "[A] court deciding how multiple enhancements interact should first examine the specific sentencing statutes.  If, as is often the case, these statutes provide the answer, the court should apply that answer and stop there."  (*Id.* at p. 159.)  As we explained above, M.A. has not offered a persuasive argument showing that the specific sentencing statutes in this case prohibit more than one GBI enhancement for any given true finding.

IX

*Welfare and Institutions Code Section 702*

M.A. asserts the juvenile court failed to specify whether many of the offenses it found true were to be classified as felonies or misdemeanors, in contravention of its duty under Welfare and Institutions Code section 702.  The People disagree.

Welfare and Institutions Code section 702 "requires the juvenile court to declare on the record at a hearing 'before or at the time of disposition' its choice whether to treat an alleged wobbler as a misdemeanor or as a felony."  (*In re F.M.* (2023) 14 Cal.5th 701, 712.)  We need not resolve this claim because the juvenile court can address it on remand when it crafts a new disposition.

X

*"Other Disposition Errors"*

We need not resolve M.A.'s remaining claims of dispositional error because they can be resolved on remand.

31

M.A. contends the juvenile court (1) miscalculated his maximum term of confinement, (2) improperly imposed a determinate commitment, and (3) misapplied section 654 as to counts 12 and 13 when calculating the maximum term of confinement. In criminal court, "when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) The same principle applies in juvenile court. (See *In re Shaun R*. (2010) 188 Cal.App.4th 1129, 1140 ["every time a ward appears for disposition, the court may consider the minor's entire history and the order must be all encompassing"].) Since we strike four of the juvenile court's Vehicle Code section 2800.3 true findings, a new disposition is required. These three claims can be resolved on remand.

DISPOSITION

Four of the five Vehicle Code section 2800.3 true findings are stricken. The GBI enhancement for the surviving Vehicle Code section 2800.3 true finding is stricken. The wardship adjudication is otherwise affirmed and the disposition order is reversed. The matter is remanded for proceedings consistent with this opinion.

/s/
BOULWARE EURIE, J.

We concur:

/s/
ROBIE, Acting P. J.

/s/
FEINBERG, J.

32